AO 91 (REV.5/85) Criminal Complaint          AUSAS Tyler Murray & Christopher Stetler (312) 353-7846/7602

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

*FILED*
AUG 0 1 2011
8-1-2011
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

**CASE NUMBER:**

MUYI SHOGBUYI,
CHARLES PATTERSON,
SHAMEKIA KIMBROUGH,
MONALISA McKINNEY and
GEORGE LIVINGSTON, aka
"MALIK LIVINGSTON"

**UNDER SEAL** **11CR0515**

*MAGISTRATE JUDGE BROWN*

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: From on or about March 8, 2011 through on or about July 20, 2011, in the Northern District of Illinois, Eastern Division, MUYI SHOGBUYI, CHARLES PATTERSON, SHEMEKIA KIMBROUGH, MONALISA McKINNEY and GEORGE LIVINGSTON, aka "MALIK LIVINGSTON," defendants herein:

> knowingly executed and attempted to execute a scheme to defraud and to obtain money and funds owned by, and under the custody and control of, a financial institution by means of materially false and fraudulent pretenses, representations, and promises;

in violation of Title 18, United States Code, Sections 1344 and 2. I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
JODY BLAU
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

August 1, 2011                                   at   Chicago, Illinois
Date                                                  City and State

GERALDINE SOAT BROWN, U.S. Magistrate Judge       _____
Name & Title of Judicial Officer                   Signature of Judicial Officer

UNITED STATES DISTRICT COURT  )                 **UNDER SEAL**

                                     ) SS

NORTHERN DISTRICT OF ILLINOIS  )

## AFFIDAVIT

I, Jody Blau, having been duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately three years.  My responsibilities include the investigation of allegations of bank fraud, corporate fraud, and money laundering, among other crimes.

2.      As part of my duties and responsibilities as a Special Agent with the FBI, I have been involved in an investigation of Muyi Shogbuyi ("Shogbuyi"), Charles Patterson ("Patterson"), Shamekia Kimbrough ("Kimbrough"), Monalisa McKinney ("McKinney") and George Livingston, aka "Malik Livingston" ("Livingston"), among others, concerning violations of Title 18, United States Code Sections 1344 and 2, as described more fully below.

3.      This affidavit is submitted for the limited purpose of establishing probable cause that Shogbuyi, Patterson, Kimbrough, McKinney and Livingston knowingly executed, and attempted to execute, a scheme to defraud and to obtain money and funds owned by, and under the custody and control of, a financial institution by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Sections 1344 and 2.

4.     I make this affidavit from personal knowledge based on my participation in this investigation, including review of consensual audio/video recordings of in-person meetings, consensual audio recordings of telephone conversations, email correspondence, sms text messages, witness statements, and documents; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this affidavit is being submitted for the limited purpose of supporting a finding of probable cause, it does not include all details known to me concerning this investigation.

5.     Based on my training and experience, I understand that, at all times relevant to this investigation, bank lenders required applicants for mortgage loans to provide truthful information, including the borrower's identity, employment, financial condition, assets, liabilities, payment history, rental income, contributions to the purchase price, and intention to occupy the property purchased; the distribution of the loan proceeds; and the sales price, value and condition of the property, all of which was material to bank lenders' approval, terms, and funding of mortgage loans.

### Background of the Investigation

6.     In early 2011, the FBI initiated an undercover operation in which a cooperating individual ("the CI") posed as an individual who was engaged in mortgage fraud and was seeking assistance in structuring fraudulent mortgage loan transactions. The CI claimed to have a contact at Bank A who would approve fraudulent mortgage loan applications on

behalf of straw buyers provided by the CI.[1] An undercover law enforcement agent ("the UC") posed as the straw buyer. In addition, Bank A, an FDIC-insured financial institution, cooperated in this investigation.

7.     As described more fully below, as part of this undercover investigation, Shogbuyi introduced the CI and the UC to Patterson, who agreed to facilitate a fraudulent mortgage loan transaction involving the sale of a residential property owned by Patterson to a straw buyer provided by the CI. Patterson agreed to conceal from Bank A a kickback of a portion of the seller's loan proceeds to the straw buyer. Shogbuyi also recruited Kimbrough, who provided a fraudulent verification of rent for the straw buyer. McKinney, a licensed Illinois appraiser who provided an appraisal for the property, recruited Livingston to provide a fraudulent verification of employment for the straw buyer.

## Details of the Scheme

8.     On March 8, 2011, the CI telephoned Shogbuyi and introduced himself/herself as a mutual friend of Individual A. The CI said s/he was looking for "business" opportunities and explained that s/he had people who were interested in purchasing properties for which

---

[1]The CI has been charged with mortgage fraud-related offenses and is cooperating in the hope that the government will be more lenient in its charges or recommend a reduced sentence on those charges in exchange for the CI's cooperation. The government has made no promises to the CI in this regard.

the sellers would pay the buyers a portion of the mortgage loan proceeds.[2] The CI had engaged in mortgage fraud with Individual A, and understood that Shogbuyi had as well.

9.     Later the same day, Shogbuyi sent the CI a text message stating that one of the properties he was trying to sell was located at 5515 S. Honore Street, Chicago, Illinois ("the Honore property"). The text message also stated that the Honore property had a value of $350,000 and that the seller, later identified as Patterson, wanted to retain $175,000 of the sale proceeds. Shogbuyi subsequently sent an email to the CI stating that Patterson was "open to creative financing."

10.     On March 21, 2011, the CI telephoned Shogbuyi and asked him if he had someone who could appraise the Honore property for $350,000. The CI told Shogbuyi that the bank would allow whomever the CI recommended to do the appraisal. The CI also said that the buyer had no job, but good credit, and further, that the buyer only wanted money, not the property.

11.     The next day, Shogbuyi sent the CI an email stating that he had contacted his appraiser, later identified as McKinney, who stated that she was able to find comparable properties to support a $340,000 appraised value for the Honore property.

12.     On April 11, 2011, Shogbuyi met with the CI. The CI told Shogbuyi that s/he had a contact at Bank A who could get the CI's loans approved and would allow the CI to

_____

[2]All of the conversations summarized in this affidavit were audio recorded, and some were video recorded. Portions of the conversations included in the affidavit include direct quotes of the conversations. These portions are still preliminary quotations, and they may be modified upon further review.

direct appraisals to an appraiser of the CI's choosing. Shogbuyi asked the CI how much money s/he wanted to make on the deal. The CI responded that the buyer wanted to be paid the difference between $175,000 and the amount of the appraisal, and that the CI would keep a small portion of the buyer's proceeds.

13. On April 13, 2011, the CI telephoned Shogbuyi. Shogbuyi said he checked with an appraiser, who said the Honore property would appraise for between $300,000 and $330,000.

14. On April 14, 2011, the CI telephoned Shogbuyi. The CI explained that the buyer would be willing to provide earnest money if the buyer could meet with Patterson to ensure that Patterson would pay the buyer the agreed-upon portion of the sale proceeds.

15. Later the same day, Shogbuyi met with the CI. During the meeting, the CI presented a blank real estate contract to Shogbuyi and proceeded to complete and sign the contract in the name of the UC, the purported buyer.[3] The CI left the contract with Shogbuyi so he could obtain Patterson's signature. Shogbuyi said the buyer would get paid after the closing pursuant to an agreement between the buyer and Patterson. Shogbuyi then said he had two appraisers who would appraise the Honore property at the value they wanted.

16. On April 26, 2011, Shogbuyi met with the CI and the UC. During the meeting, Shogbuyi presented the CI and the UC with an "Addendum to Real Estate Contract," which stated that Patterson would receive $175,000 from the loan proceeds, and that the UC would

---

[3]The name used by the UC is fictitious and used solely for purposes of law enforcement investigations.

5

receive all loan proceeds in excess of $175,000.

17.     On April 29, 2011, Shogbuyi and Patterson met with the CI and the UC at the Honore property. During the meeting, the CI asked Patterson if he would be open to different ways of structuring the transaction. Patterson expressed concern about raising a "red flag." Patterson then suggested that one option for structuring the transaction would be for the UC to set up a joint checking account with Patterson, from which the UC could withdraw his/her portion of the proceeds. Patterson then asked the UC how much money s/he wanted to receive. The UC said s/he wanted to receive $100,000. The UC then stated that another option would be to file a mechanic's lien against the property, which could be paid off at closing. Patterson asked the UC to draft something that explained some of the options so that Patterson could pick the option he liked best.

18.     On May 5, 2011, a law enforcement agent purporting to be the CI sent an email to Patterson and Shogbuyi detailing three payment options. Under the first option, Patterson would direct the title company to issue a check to a company controlled by the UC. Under the second option, Patterson and the UC would open a joint checking account, into which the loan proceeds could be deposited, and out of which the UC could withdraw his/her portion of the proceeds. Under the third option, Patterson would direct the title company to issue a check to a company controlled by the UC, and a lien could be placed on the Honore property for the remaining amount. The lien could then be paid off at closing. The email stated that the UC preferred the third option, because it would have better tax benefits, and it would be

less likely to raise suspicions.

19.     The next day, Shogbuyi telephoned the CI. Shogbuyi said he had spoken with Patterson regarding the three options described in the May 5, 2011 email. According to Shogbuyi, Patterson was considering the first and third options. Shogbuyi said he would prepare an addendum for each of the options so that Patterson could pick the one he wanted.

20.     On May 10, 2011, Shogbuyi met with the CI and the UC at a restaurant in Chicago. During this meeting, Shogbuyi presented a new real estate purchase contract that contained a sales price of $300,000. Shogbuyi advised that he had created three sets of addenda, so that Patterson could pick the method he wanted. During their meeting, the CI asked Shogbuyi if he could help find someone who could provide a verification of rent ("VOR") for the buyer. Shogbuyi said he would try to do so.

21.     On May 11, 2011, Shogbuyi telephoned the CI and said he had spoken with a contact regarding the VOR, and the contact had some questions. The CI stated that the bank wanted to speak with a management company to conduct the VOR, and Shogbuyi said he would follow up with his contact.

22.     On May 12, 2011, Shogbuyi, Patterson and McKinney met with the CI and the UC at the Honore property. During the meeting, Patterson told the CI and the UC that he had decided to pay half of the UC's proceeds to a company controlled by the UC and the other half as a purported lien payoff that would be listed on the HUD form at closing. Patterson then asked, "It's all legal, right? I mean, I don't know the law well enough. You guys

7

probably know it better than I do." The UC responded, "I mean, you are being honest with me, I am going to be honest with you . . . we are here, this is between us, you know what I'm saying, it ain't legal, I mean, but on paper we are making it look legal. . . ." The UC further explained that the transaction would be structured "so as not to raise red flags, because with this lien, what it does, you know, you can say that [a company] did all this repair work, whatever, however you want to do it, and that justifies why you paid it out to them as opposed to you turning around and writing me a check or giving me cash, then ya, that is going to raise red flags, why are you giving the buyer all of this money? So, ya, it's illegal, shit, I mean, ya, this is illegal, but in the end this is going to cover it." Patterson responded, "okay." The UC then asked, "Are you cool with that? I mean, that is what I am saying, I just want to be honest with you." Patterson responded, "I don't want to get in trouble, and I don't want anybody else to get into trouble." The UC then stated, "Well, that's why I say, I don't want you to do anything that you . . . without me being honest with you about it, I wouldn't ask you to do this if I wasn't being honest. . . . I could come in here and tell you, 'No, this is legal.' No, this is illegal, but I've been doing this before, and I know how to make it all work out." The UC asked Shogbuyi if he had used McKinney before. Shogbuyi said he had used McKinney before and that he called her because she would appraise the Honore property for the value they wanted. Shogbuyi then told the UC that he had found someone who could do the VOR for a fee. Toward the end of the meeting, the CI told Shogbuyi and Patterson that his/her understanding was that the sales price would be $300,000, that a

$50,000 lien would be placed on the property and paid off at closing as a partial payment to the UC, and that Patterson would pay the UC an additional $50,000 after the closing. Patterson asked the UC if s/he would buy Patterson a dinner because the UC was receiving $100,000. The UC said that s/he would buy Patterson a dinner, and that Patterson also could keep any of the money remaining from the $25,000 being used for closing costs.

23.     On May 14, 2011, then on May 17, 2011, Shogbuyi telephoned the CI and said he was still looking for someone to provide a VOR.

24.     Later on May 17, 2011, Shogbuyi sent the CI an email providing the contact information for Kimbrough, who, Shogbuyi stated, would do a VOR for $400 using her company.

25.     Later the same day, Shogbuyi telephoned the CI and asked for a copy of a blank VOR form.

26.     On May 18, 2011, the CI telephoned Kimbrough. During the call, the CI said that Shogbuyi told the CI to call about providing a VOR. The CI explained that s/he assisted the buyer of the Honore property and that s/he had a connection with the bank. Kimbrough said she had a property management company that was not in good standing with the state, and that she would do the VOR in exchange for the CI paying a $300 fee that would put Kimbrough's company back into good standing. Kimbrough said she also had properties that she was trying to sell, and she asked if the CI could provide buyers. The CI asked Kimbrough to email the information to him/her, adding that his/her buyers wanted to be paid

9

for buying properties. Kimbrough said she understood.

27. On May 19, 2011, Shogbuyi telephoned the CI to schedule a meeting with Kimbrough regarding the VOR. The CI said s/he had the $300 that Kimbrough had requested, plus $100 for Shogbuyi for Shogbuyi's assistance in obtaining the VOR.

28. On May 22, 2011, McKinney emailed the CI the Honore property appraisal, which had an appraised value of $300,000.

29. The following day, the UC met with Shogbuyi. The UC asked how much the VOR would cost, noting that Shogbuyi had stated it would cost $400 and Kimbrough had told the CI it would be $300. Shogbuyi said the VOR would cost $400, which the UC then paid Shogbuyi. The UC asked Shogbuyi how Patterson was doing. Shogbuyi responded that Patterson was trying to protect himself and that Patterson wanted to ensure that the Honore property was not abandoned right away because he didn't want the bank to "come after him." Kimbrough then arrived at the meeting and asked the UC where s/he wanted Kimbrough to say the UC lived. The UC gave Kimbrough an address. Kimbrough said that if the bank checked, it would see that she did not own the property at the address the UC provided. Kimbrough suggested that they use a property she owned. The UC agreed, but explained that the VOR needed to indicate that the UC had lived at the property for two years. Kimbrough responded that she had owned the property for only one year. The UC said it would not make a difference because the UC's bank contact was "on board." Kimbrough signed the VOR form, which falsely stated that the UC had lived at Kimbrough's address for two years.

Kimbrough asked how much the UC was claiming that s/he paid in rent. The UC responded that s/he would say the rent was $1,000 per month. Kimbrough then asked if her company would be returned to good standing, and Shogbuyi said he would take care of it the following day.

30.     On June 9, 2011, the UC left a voicemail with Patterson stating that s/he was trying to obtain a verification of employment ("VOE") because s/he did not report income on his/her taxes.

31.     On June 20, 2011, a law enforcement agent mailed the loan application package for the Honore Property to Bank A. The loan application included, among other things, an application in the name of the UC for a mortgage loan in the amount of $291,000, the false VOR form that Kimbrough signed, the real estate purchase contract prepared in part by Shogbuyi and Patterson, and the appraisal prepared by McKinney.

32.     On June 22, 2011, a law enforcement agent purporting to be the CI sent a text message to Shogbuyi advising that the bank would be calling to confirm the VOR that day. The text message also requested that Shogbuyi confirm that Kimbrough would be available to take the VOR call.

33.     Later that day, a cooperating Bank A representative telephoned Kimbrough, who identified herself and falsely represented that the UC had been renting property from Kimbrough for three or four years, paying $1,000 a month in rent.

34.     On June 24, 2011, the UC left Patterson a voicemail stating that Kimbrough

11

had provided the VOR to the bank.

35.     On July 8, 2011, the UC met with Patterson at the Honore property. During the meeting, Patterson requested that the UC explain how s/he made money in real estate. The UC said s/he would tell Patterson, but that Patterson should understand that the methods the UC used were illegal. Patterson responded, "Let me tell you something. Some laws suck." The UC then explained to Patterson that s/he made money on real estate transactions by bribing appraisers and bank employees, paying people to provide fraudulent VORs and VOEs, paying financially-distressed buyers to purchase properties, and using an escrow fund to provide six months of mortgage payments before letting the properties go into default. Patterson responded, "Teach me. I'm a good student."

36.     On July 14, 2011, the UC telephoned McKinney and offered to pay her for assisting with providing a VOE for the Honore property deal. McKinney said she thought she had someone who could perform a VOE.

37.     The next day, the UC called McKinney, who called Livingston using three-way calling. After Livingston identified himself, the UC explained that s/he was buying a house and that, to do so, s/he needed a VOE. The UC explained that s/he did not have a VOE because s/he did not pay his/her taxes. The UC said that s/he had a contact at the bank who helped the UC obtain loans, and that s/he pays the contact. The UC said that s/he needed a couple of check stubs, and that the bank would conduct a verification call. The UC explained that s/he would tell Livingston when the bank would call, and that Livingston would need

12

to say that the UC worked for Livingston. In return, the UC said s/he would pay Livingston. Livingston said he just needed to meet with the UC to obtain the information. Livingston asked if any job would be acceptable. The UC responded that any job would do, so long as it paid between $5,500 and $6,500 per month. The UC said s/he paid his/her bank contact to ensure the deal went through, so the bank would not challenge the VOE. Livingston said that he would charge $500 for providing the VOE. The UC said that his/her partner would email Livingston the information for the check stubs.

38.     On July 18, 2011, the CI met with Livingston. During the meeting, Livingston, using the name Paul Brenski, signed a VOE form falsely representing that the UC was employed by Company A. Livingston then emailed the CI a copy of two check stubs falsely reflecting that the UC earned a net pay of $1,925.80 on a bi-weekly basis.

39.     Later that day, a law enforcement agent mailed the false VOE form signed by Livingston to Bank A.

40.     On July 20, 2011, a cooperating Bank A representative called the telephone number listed on the VOE form provided by Livingston. The Bank A representative spoke with an individual who identified himself as Paul Brenski and falsely stated that the UC was employed as a finance manager for Company A, earning the income reflected on the VOE form that Livingston had provided.

41.     Later the same day, Livingston telephoned the CI and said his associate had confirmed the VOE. The CI asked if the furniture company listed on the VOE was a real

13

company, and Livingston explained that it was not a real company.

42.     Later that day, the CI met with McKinney in Chicago. During the meeting, the CI paid McKinney $300 for her assistance in referring the CI to Livingston to provide the VOE.

### Conclusion

43.     Based on the facts set forth in this affidavit, I believe there is probable cause to believe that Muyi Shogbuyi, Charles Patterson, Shamekia Kimbrough, Monalisa McKinney and George Livingston, from on or about March 8, 2011 to on or about July 20, 2011, knowingly executed, and attempted to execute, a scheme to defraud and to obtain money and funds owned by, and under the custody and control of a financial institution, namely Bank A, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Sections 1344 and 2. Accordingly, it is requested that warrants for the arrest of Muyi Shogbuyi, Charles Patterson, Shamekia Kimbrough, Monalisa McKinney and George Livingston be issued.

FURTHER AFFIANT SAYETH NOT.

Jody Blau, Special Agent
Federal Bureau of Investigation


SUBSCRIBED AND SWORN TO BEFORE ME
This 1st day of August 2011

Geraldine Soat Brown
United States Magistrate Judge

14